[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I The Dissolution of the Marriage
This court finds that all of the allegations of plaintiff's complaint have been proven, that the marriage has broken down irretrievably, and the marriage is ordered dissolved for that reason.
II Conclusions of the Court Relating to Certain Property inCT Page 1293 Madras India
A. The Beach House
During the course of the trial plaintiff testified that defendant was the owner of a beach house in Madras, India which he had acquired in 1995 with a down payment of $50,000. Defendant testified that he had placed a deposit of $2,850 on such a cottage which was later returned to him about a year ago. Defendant's final words on this issue, as noted by the court, were "I don't own any beach property and have no objection to the court giving it to plaintiff." Plaintiff in her proposed orders requests that the court award her legal or equitable title to such property either by quitclaim deed from defendant or pursuant to Sec. 46b-81 C.G.S.
Inasmuch as defendant declares his willingness to convey to plaintiff title to a claimed non-existing beach house in India, and plaintiff in turn seeks an order of the court to that effect, this court orders that defendant quit claim any interest he may have in said property to plaintiff. Because of the ruling in Ivyv. Ivy, 183 Conn. 490, 492-3 (1981) this means of transferring title is ordered rather than by operation of Sec. 46b-81 C.G.S. See also Billington v. Billington, 220 Conn. 212 (1991) on the general subject of financial affidavits.
B. Hi Q Exchanges Private L.T.D. (hereinafter Hi Q)
This property in Madras, India in which defendant has a one third interest has been reported by him in his current financial affidavit as having no value. Plaintiff has hotly disputed defendant's opinion, and has requested that the court establish the value of this company.
A review of the court's notes on this subject reveals the following testimony by defendant: "I own 4000 shares in Hi-Q. I don't know how many shares are out. I own one third of the company. It is going to manufacture heat pipe and heat exchanges. We received a government loan from Tamil. I invested $11,050. It was incorporated in 1991. A building has been completed on the property. The company manufactures nothing new. The building is empty. The liabilities exceed the assets." Later defendant stated that there was "no production — no orders" at the present time. CT Page 1294
James Belfiore, a C.P.A. called by defendant, testified that he was defendant's accountant and that Hi-Q had no value at the present time. He stated further that the company had been financed by six investors and a guaranteed government loan.
Both the defendant and Mr. Belfiore were cross-examined at length by plaintiff's counsel.
On the evidence submitted the court finds that defendant's interest in Hi-Q has no present value.
C. Pre-Marital Property of the Parties
1. Plaintiff
The evidence indicates that plaintiff together with nine other siblings has an interest in the ancestral home in India. In addition, she and her daughter also own a home and two acres of land in India formerly owned by plaintiff's deceased first husband. These properties are found not to be part of the marital estate of the parties.
2. Defendant
Plaintiff testified briefly that defendant had an interest in a house and land in a village in India where his father resided. Defendant on his financial affidavit mentions his one sixth interest in the ancestral home. This property will not be considered part of the marital estate of the parties.
III The Marital Estate of the Parties
Plaintiff
16 Hearthstone Drive value $170,000 Simsbury, CT Less 1st mtg 63,667 Less 2nd mtg 39,731 ------ -103,398 _________ Total Equity 66,602 One Half Interest $33,301 $33,301 1997 Toyota RAV4 (leased) — Bank accounts 640 CT Page 1295 Household furniture, jewelry, etc. — Life insurance. Bristol Hosp. F.V. $80,000 C.S.V. — Bristol Hospital Pension 13,262 Fleet I.R.A. 6,600 ------ Sub-Total $53,803Defendant
 One half interest in equity in family home $33,301 1989 Volvo 740 Wagon 2,500 Household furniture, etc. — Bank account — Webster 6,093 1000 shares East West Traders 50,000 Hi-Q Exchanges — Private Ltd. — Note from East-West Traders 23,884 Life Insurance-Northwest F.V. $115,000 C.S.V. — ------ Sub-Total $115,778 Total Marital Estate $169,581
IV The Evaluation of the Evidence in Accordance with the Provisions of Sec. 46b-81c C.G.S.
A. General Background Information
The plaintiff wife, who is fifty one years of age, and the defendant husband, who is forty six, were married on April 19, 1976 in Madras, India. This was the defendant's first marriage and the plaintiff's second, her first husband having died in 1971. Plaintiff had one child from her first marriage, a daughter Marla, now twenty seven years of age. Marla had graduated from the University of Connecticut with a degree in biology and is presently an electronic administrator for a local insurance company and residing in Windsor Locks. There are two children of this marriage, a son Aristotle, now twenty years old and a junior at Columbia University where he is majoring in engineering, and a daughter Thenral, age eighteen, who is presently attending a medical school in India.
Both of the parties are well educated. Plaintiff obtained a B.S. degree in 1974 after receiving prior degrees in nursing and midwifery. Defendant for his part received a B.S. degree in mechanical engineering from Annamalai University in 1972 while in India and later obtained a M.A. degree in nuclear engineering from Columbia University in 1979. CT Page 1296
After leaving India the parties first settled in New York in 1976. Plaintiff secured employment as a nurse and supported the family while defendant continued his studies at Columbia University. After defendant completed his studies in 1979 the family moved to Richmond, Virginia, where defendant had obtained employment as an engineer at a utility company where he earned $20,000 annually. Plaintiff, whose annual income as a nurse in New York was $22,000, was able to secure similar employment in Richmond where her annual income was $20,000.
In 1982, after defendant was offered employment at Combustion Engineering (now A.B.B.) The parties moved to Connecticut where they purchased a house in Simsbury.
Defendant earned about $27,000 per year at A.B.B. while plaintiff again managed to secure nursing employment at Mt. Sinai Hospital at $20,000 per year. In 1986 plaintiff began her present employment as a nurse at Bristol Hospital. Her current financial affidavit reflects a gross weekly income of $932 and a weekly net after the usual deductions of $624.
About 1991 defendant left his work as an engineer at A.B.B. and formed his own company, East West General Traders, Inc. of which he is the president, as well as sole director and stockholder. The company imports fabric and granite from India and has a secondary source of granite in Vermont. Defendant on his most recent financial affidavit reports a gross weekly income from this enterprise of $1058 with a net weekly income from all sources after the usual deductions of $748. Defendant's following comments on his business are noted: "If I can't work, the business dies. I have the contacts. The business is doing all right now. Profits are down in 1996. The future outlook is sometimes good, sometimes bad. Market conditions could change at any time."
Defendant and six other partners also are the owners of a heat treatment company in Madras, India known as "Hi-Q". Defendant in his testimony described his interest in this company as follows: "I own 4000 shares in Hi-Q. I don't know how many shares are out. I own one third of the company. It is going to manufacture heat pipe and heat exchanges. We received a government loan from Tamil. I invested $11,050 in the company." The company owns land and a building which defendant describes as "empty". Defendant described the financial condition of the CT Page 1297 company in brief as follows: "The company manufactures nothing now. The liabilities exceed the assets."
B. The Health of the Parties
Plaintiff describes her health as "pretty good". She still has residual back pain resulting from a car accident in which she was involved in 1996 which caused her to lose six weeks of work. She also had a hysterectomy last year.
Defendant appears to be in reasonably good health.
C. Causes for the Dissolution
Each of the parties gave a lengthy account of the faults and failings of the other. An examination of the notes of the court reveals the following:
Plaintiff:
"Things got rough after 1979. He was angry most of the time. He called me such names as headless pig, prostitute, and idiot. About 1990 he hit me on the head with his shoe — I required seven stitches as a result. He hit me with a belt every six months. He would throw things, even a chair at me. We argued about finances and raising the children. Nevertheless, until he said in his deposition that he didn't love me I thought there was hope for the marriage."
Defendant
Defendant's declarations concerning the reasons for the breakdown of the marriage are equally graphic: "Before the marriage she treated me as a god, afterward as garbage. She didn't like me to teach the children. She was jealous and envious. If I asked the children to study, we'd argue. She was always lying. She'd call me a son of a prostitute, she'd spit on me. She'd throw dishes, food, pocketbooks and slippers at me. I consulted an attorney in 1995. I wanted to keep the family together."
More compelling and persuasive than the testimony of the parties on this factor was that of their son, Aristotle, and plaintiff's daughter, Thenral, from a previous marriage. These children, both adults, gave unhesitating testimony exposing CT Page 1298 plaintiff as responsible for the breakdown of the marriage.
In the words of son Socrates "my mother was jealous of my father. She would irritate him, but he would break it off. She would keep poking and poking. I saw her throw things at him, including a metal plate. She was harsh and mean to the children." When questioned about his appearance at this trial he stated "I wanted to be here today." He concluded his testimony on this factor in stating "My dad must have loved my mother to have stayed through twenty years of hell."
Marla, age 27, plaintiff's daughter and defendant's stepdaughter, was equally candid and forthright. In her words "my relationship with my mother has always been bad. She acted like a headmaster, not a mother. There was no love or affection. She was devious in so many ways and it hurts. She has good intentions, but the things she does would make me feel otherwise. I don't have a poor relationship with her. My stepfather is more logical, more nurturing. He taught me many things, including how to tell time. My mother didn't like this and was very jealous."
Having considered all of the evidence on this factor, this court concludes that responsibility for the breakdown of the marriage rests with plaintiff.
D. Other Factors
While the vocational skills and employability of the parties are felt to be equal, the evidence would indicate that defendant has a better opportunity than does plaintiff for the future acquisition of capital assets and income.
Defendant's contribution to the marital estate exceed those of plaintiff.
The parties have similar needs. The liabilities of defendant exceed those of plaintiff.
CONCLUSION
Having reviewed and weighed all of the evidence as it relates to Sec. 46b-81c C.G.S. this court concludes that the marital estate of the parties should be divided in the following manner: CT Page 1299
plaintiff 50%
defendant 50%
V. The Distribution of the Marital Estate in Accordance with the Findings Made in Article (Supra)
Total Marital Estate $169,581
Plaintiff's share 50% 84,791
Defendant's share 50% 84,790
Plaintiff shall take and have:
 1997 Toyota RAV4 (leased) — Bank accounts 640 Household furniture, jewelry, etc. — Life Insurance Bristol Hosp. F.V. $80,000 C.S.V. — Bristol Hospital — pension 13,262 Fleet I.R.A. 6,600 Bank account Webster (from defendant) 6,093 Amount owed plaintiff by defendant 58,196 ------- Total due plaintiff $84,791
 Defendant shall take and have:
 Entire equity in 16 Hearthstone Drive, $66,602 Simsbury, CT Household furniture, etc. — 1000 shares East West General Traders, Inc. 50,000 Hi-Q Exchanges, Private Ltd. — Note from East West Traders 23,884 Life Insurance — Northwest F.V. $115,000 C.S.V. — 1989 Volvo 740 wagon 2,500 ------- $142,986
 Less amount owed plaintiff -58,196 ------- Total due defendant $84,790
VI Supplemental Orders Relating to the Distribution of the Marital Estate
CT Page 1300
A. Plaintiff's Debt to Defendant
The file on this matter reflects that on June 24, 1997 this court determined that plaintiff owed defendant $4,250 in child support and attorney's fees. Said sum is deducted from the $58,196 defendant owes plaintiff, leaving a net balance due plaintiff from defendant in the amount of $53,946.
B. Plaintiff shall forthwith quitclaim to defendant all of her interest in premises known as No. 16 Hearthstone Drive, Simsbury, Connecticut.
C. Said debt in the amount of $53,946 due plaintiff by defendant shall be evidenced by his promissory note to her in that amount. Said note shall bear interest at the rate of five percent per annum and shall be due and payable in the following manner: By the payment of $10,000 together with accrued interest one year from date hereof and by the further payment of a like sum of $10,000 together with accrued interest annually thereafter until January 12, 2003, at which time all then remaining balances of principal and interest shall be fully due and payable.
Said note shall also contain a clause providing that the maker may anticipate payments of principal or interest in whole or in part at any time without penalty.
Said note shall be secured by a mortgage on said premises subordinate only to the present first mortgage to Peoples Savings Bank and to a subsequent mortgage to the Small Business Administration in the approximate unpaid principal balance of $39,000. Defendant at the time he receives title from plaintiff shall be responsible for the release from said premises of any prior lien thereon resulting from a line of credit extended to the parties by Shawmut Bank.
D. Both parties shall execute all documents necessary to carry out the orders of this court.
VII Alimony
Having considered all of the provisions of Sec. 46b-82
C.G.S. as they pertain to the evidence before this court, it is ordered that defendant pay to plaintiff as alimony the sum of $1 per year until July 16, 2008, at which time plaintiff shall have CT Page 1301 attained the age of 62 and be eligible to obtain social security.
This order shall be non-modifiable only as to term and shall sooner terminate upon the remarriage of the plaintiff, the death of either party, or plaintiff's cohabitation with an unrelated male within the meaning and intent of Sec. 46b-86(b) C.G.S.
VIII Other Orders
A. Health Insurance
Neither party has requested an order in this regard, and none is made.
B. Liabilities
Each party shall be solely and individually responsible for any and all debts charged solely to that party. Where the parties have jointly incurred debts, said joint obligation in equal shares shall continue.
C. Counsel Fees
No award of counsel fees is made to either party.
D. Life Insurance
Defendant shall continue to maintain all life insurance policies presently in effect with the plaintiff as irrevocable beneficiary during such time as defendant shall be required to pay alimony to plaintiff.
John D. Brennan, Judge Trial Referee